# EXHIBIT 10

Excerpts from Transcript of Hearing
1-4-2019

# EXHIBIT 10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

IN RE:

ANTHONY THOMAS and
WENDI THOMAS,

           Debtors.

. . . . . . . . . . . . . .

.  Case No.  14-50333-btb

.  Chapter 7

.  300 Booth Street
.  Reno, NV 89509

.  Friday, January 4, 2019
.  10:13 a.m.

TRANSCRIPT OF DISCOVERY DISPUTE HEARING RE: DOC# 430
MOTION TO SELL FILED BY JEFFREY L. HARTMAN ON BEHALF OF
JERI COPPA-KNUDSON
BEFORE THE HONORABLE BRUCE T. BEESLEY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            ANTHONY THOMAS (Pro Se)
                            7725 Peavine Peak Court
                            Reno, NV 89523

For the Chapter 7           Hartman & Hartman
Trustee:                    By: JEFFREY L. HARTMAN, ESQ.
                            510 West Plumb Lane, Suite B
                            Reno, NV 89509
                            (775) 324-2800

Chapter 7 Trustee:          JERI COPPA-KNUDSON, ESQ.
                            3495 Lakeside Drive
                            PMB #62
                            Reno, NV 89509
                            (775) 329-1528

Audio Operator:             David Lindersmith, ECR

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46038
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

7

1   THE COURT:  March 8th, okay.

2   MR. HARTMAN:  Was one that -- because I had gotten a

3 call from Mr. Silver, who represents Kenmark.  He couldn't be

4 here on the February 22nd date.  We tried -- circled around the

5 March 8th date.  That was okay for him and for me, but it was

6 over the New Year's interlude and I didn't get back to court

7 staff.  So right now, we don't have a specific date for the

8 continued hearing.

9   THE COURT:  Okay.  Go ahead.

10   MR. HARTMAN:  That's it.  That's where we are.

11   THE COURT:  Mr. Thomas?

12   MR. THOMAS:  Thank you, Your Honor.  I'd like to

13 address everything that Mr. Hartman spoke to.  Number one, my

14 -- I was opposing the sale of the emerald because Mr. Hartman

15 did not follow the rules and notify all the creditors and

16 myself 21 days ahead of time, according to the Rule --

17   THE COURT:  Okay, stop.  Mr. Hartman, it appeared to

18 me that the notice was timely.

19   MR. HARTMAN:  Your Honor, I explained it in the

20 transcript.  It's there in black and white.  We got the

21 auctioneer approved.  He conducted the auction.  Then, I set a

22 hearing to approve the terms of the auction and the buyer.

23   THE COURT:  Right.

24   MR. HARTMAN:  Everybody got notice of that process.

25 It's in the certificate of service.  The matrix was noticed of

8

1   the hearing to approve the sale by auction.  It has not been

2   concluded.

3           THE COURT:  Okay.  So move on because I'm not -- the

4   sale can go forward as it is now scheduled.  People have

5   notice.  You've had notice.  Move on.

6           MR. THOMAS:  Your Honor, I want to make a --

7           THE COURT:  Move on.

8           MR. THOMAS:  -- I want to make a clear record, and I

9   don't want you to take away my constitutional rights.  They did

10   not notice people properly.

11           THE COURT:  Well, first off --

12           MR. THOMAS:  They're supposed to be sent out by the

13   clerk under 202.

14           THE COURT:  Please call security.  Have them come in.

15           Mr. Thomas, you have to behave.  You can't yell at

16   the judge.  You can't yell at opposing counsel.  I'm not going

17   to yell at you.  So --

18           MR. THOMAS:  Your Honor, I don't want you to block me

19   from making a clear record, and that's what you're doing, and I

20   think you should recuse yourself.

21           THE COURT:  Not by having security here, am I?

22           MR. THOMAS:  I think you should recuse yourself

23   because of a bias.  You don't want me to make a clear record

24   that he did not notify everybody according to the rules, which

25   he did not.

1        THE COURT:  So --

2        MR. THOMAS:  And the clerk is supposed to send out

3 the notice, and that was -- that did not happen.  It's not on

4 the docket.

5        THE COURT:  So where is your evidence?

6        MR. THOMAS:  It's not on the docket.

7        THE COURT:  Where is your evidence?

8        MR. THOMAS:  Where's my evidence?

9        THE COURT:  Right.  You need to present evidence.

10 Where is your evidence that this didn't happen?

11        MR. THOMAS:  I've looked at the court docket.  I

12 didn't receive a notice for 21 days ahead of time of the sale

13 of the emerald.  And according to 600 -- I think it's 6 and

14 202, they're supposed to notify all creditors and myself 21

15 days prior to the sale.  They did not do that.  They didn't

16 comply with the rules and the law.  And that's why the sale

17 should be void.  He didn't do that, and he said in court he

18 did, but he did not.  And I looked at all the rules, and he did

19 not follow the rules.

20        THE COURT:  So I read through your pleadings.  Have

21 you -- other than talking, have you provided any documentary

22 evidence that shows --

23        MR. THOMAS:  I haven't filed my opposition yet

24 because it's not due until 14 days before the hearing, and my

25 understanding is the hearing was going to be -- Illuminada

-153-

1  called me and told me that Mr. Hartman was not going to be able

2  to make the hearing on the 8th.

3          THE COURT:  And it's going to be moved.

4          MR. THOMAS:  And that it was going to be moved, and

5  she told me the date was going to be March 22nd.

6          THE COURT:  And that's fine.

7          MR. THOMAS:  So I put that in my order that --

8          THE COURT:  All right.  So --

9          MR. THOMAS:  -- the date would be March 22nd.  I also

10  want to address a few other things that Mr. Hartman --

11          THE COURT:  So just listen to me for a minute.

12          MR. THOMAS:  Okay.

13          THE COURT:  You have to provide a written motion

14  opposing it --

15          MR. THOMAS:  Yes.

16          THE COURT:  -- and attach evidence.

17          MR. THOMAS:  I am going to attach evidence.

18          THE COURT:  That's fine.

19          MR. THOMAS:  Yes.

20          THE COURT:  That's fine.  Stop.  Okay.  What is your

21  next problem?

22          MR. THOMAS:  My next problem is Mr. Hartman's

23  representations to this Court.  He said when he filed his

24  declaration that Overstock.com required $250,000 up front and

25  that's why he didn't use them.  And I filed a document with the

1      THE COURT:  Okay.  No, I don't want to hear an "and."

2      MR. THOMAS:  I just want to respond to --

3      THE COURT:  I didn't ask you a question other than

4  "do you understand".

5      MR. THOMAS:  I do understand, but I want to address

6  that because Mr. Hartman did take --

7      THE COURT:  You can address that.

8      MR. THOMAS:  -- possession of my parents' house --

9      THE COURT:  You --

10      MR. THOMAS:  -- without a court order.

11      THE COURT:  Mister --

12      MR. THOMAS:  He did --

13      THE COURT:  Stop.  Just stop.  Mr. Hartman doesn't

14  need a court order to take possession of the house in Plumas.

15      MR. THOMAS:  And, excuse me, that was my parents'

16  house.

17      THE COURT:  You -- stop.  Stop.  Stop.  You listed

18  that on your schedules as your property.  When the case was

19  filed, it becomes the trustee's property when it's converted to

20  a Chapter 7.  That's what happened here.  You listed the house

21  that you claim is your parents' house in Plumas area.  The

22  trustee took control of that, which the trustee was entitled to

23  do.  Had you registered that, had you not put it in your

24  schedules, the trustee couldn't have done that.  If the title

25  was in your parents' name, the trustee could not have done

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

22

1   that.

2           MR. THOMAS:  Your Honor, I made it very clear to the

3   trustee that the property was conveyed to my parents in 2008,

4   and the deed was given to them in 2008.  They --

5           THE COURT:  And stop.

6           MR. THOMAS:  -- they knew that prior to them taking

7   --

8           THE COURT:  And stop.

9           MR. THOMAS:  -- possession of the home.  That is

10  illegal.

11          THE COURT:  And stop.  Well, according to California

12  law, an unrecorded deed is void.

13          MR. THOMAS:  Your Honor, I've cited that law on the

14  record many times, and I believe that you are wrong.

15          THE COURT:  Okay.  That's fine.

16          MR. THOMAS:  According to California law, the deed is

17  not void.  If you give them a deed in 2008 and I conveyed the

18  deed to them, then the property is theirs.  And that's what

19  California law says.  It doesn't say it has to be recorded, as

20  you've stated many times on the record.

21          THE COURT:  Well, that's what I read.  So -- but did

22  your parents record the deed?

23          MR. THOMAS:  I said in the 341 meeting they did not

24  record the deed.

25          THE COURT:  No, no, I'm talking about today.

-156-

1        MR. THOMAS:  No, because Mr. Hartman changed the

2   title of the property into his name.

3        THE COURT:  Okay.

4        MR. THOMAS:  So I have to go in to the court.

5        THE COURT:  Where is the deed?  Where is the deed?

6        MR. THOMAS:  My parents have the deed.

7        THE COURT:  Okay.  Why didn't your parents record the

8   deed?

9        MR. THOMAS:  Because my dad is 89 years old.  My

10  parents --

11        THE COURT:  Why didn't you record it for him?

12        MR. THOMAS:  My parents -- he's -- has dementia.  My

13  mom takes care of him full time.  And Plumas County is a few

14  hundred miles away from where they live, so --

15        THE COURT:  I believe they get mail to Plumas County.

16        MR. THOMAS:  What's that?

17        THE COURT:  I believe they have mail that goes to

18  Plumas County.

19        MR. THOMAS:  I don't know why they didn't go to

20  Plumas County and record the deed.  I just know that the deed

21  was conveyed to them in 2008, and that's where it stands, and

22  the trustee knew that back then.  And according to the rules

23  and the law, if the deed was conveyed, she didn't have the

24  right to take it over.  So that's an illegal possession of

25  property.  It's breaking and entering, and --

-157-

1       THE COURT:  Well, that is not actually before us.  I

2  disagree with you on your understanding of California law with

3  respect to a deed that's not been recorded.  Stop.  I'm not

4  asking you a question.  And you can take appropriate measures

5  by filing something in court in -- here or by filing something

6  in California to set aside the deed.  I don't -- I'm not --

7  I've not had a lot of experience setting aside deeds or getting

8  deeds or that kind of stuff, but you listed in your bankruptcy

9  the deed to the Plumas County as your property.

10      MR. THOMAS:  I --

11      THE COURT:  And --

12      MR. THOMAS:  I don't believe I did.  I said in the

13  341 meeting that --

14      THE COURT:  I didn't ask you what the 341 meeting.  I

15  said in -- stop.  In your pleadings, you said the -- you listed

16  the property in Plumas County as yours, correct?

17      MR. THOMAS:  I'm not sure, Your Honor.  I listed the

18  property --

19      THE COURT:  Okay.  That's fine.  That's fine.

20      MR. THOMAS:  -- as my parents'.

21      THE COURT:  Stop.  That's fine.

22      MR. THOMAS:  I'm not sure about the legal -- because

23  as you know, I'm not an attorney.  I did what the --

24      THE COURT:  I'm aware of that.

25      MR. THOMAS:  -- attorneys told me to do, and I've

ACCESS TRANSCRIPTS, LLC      1-855-USE-ACCESS (873-2223)

1  told --

2        THE COURT:  I don't care what attorneys told you to
3  do.

4        MR. THOMAS:  I understand.  It was conveyed to them
5  in 2008, and the attorneys knew that.  So when they filled out
6  my schedules, they were supposed to fill them out
7  appropriately, and I thought that they were and I thought that
8  everything was approved, and I clarified it in the 341 meeting
9  when the trustee had some questions about it  over three and a
10 half years ago.

11       THE COURT:  Right.  And your clients, in that whole
12 -- and your parents, in that whole time, never recorded the
13 deed?

14       MR. THOMAS:  They never recorded the deed.

15       THE COURT:  Okay.  So you may have a seat.

16       Mr. Hartman.

17       MR. HARTMAN:  Your Honor, just what -- for the
18 record, on that issue, there will be a hearing sometime in the
19 future after I take the Rule 2004 exam of Mr. Thomas's mother
20 regarding the original deed.

21       THE COURT:  Okay.

22       MR. HARTMAN:  That's not an issue today.  What we
23 need is a continued hearing date and time.

24       THE COURT:  Okay.  This will take -- I will give you
25 -- I know you want to get done with this case.  I know it needs

1  to be taken care of, but Mr. Thomas needs to properly present

2  some of his complaints to the Court in a manner that everybody

3  has a chance to look at them reasonably and have time to look

4  at them.  So I will continue this hearing for 60 days.

5       Let's see, your motions, Mr. Thomas, with evidence

6  need to be filed with the Court within 30 days.  Do you

7  understand that?

8       MR. THOMAS:  Your Honor, could I ask -- respectfully,

9  the first date was March 22nd.  It was put on the calendar, and

10  if I could have those motions filed, according to the rule, 14

11  days ahead of that March 22nd date because I will follow the

12  rules and file all the motions properly.

13       THE COURT:  No, no, that's fine.

14       MR. THOMAS:  That's what I wanted to do, Your Honor.

15       THE COURT:  Mr. Hartman.

16       MR. HARTMAN:  I think there's some confusion, if I

17  may try and clarify.

18       THE COURT:  Please.

19       MR. HARTMAN:  One item that Mr. Thomas will want to

20  file is an objection to approving the sale by auction.  That

21  will be 14 days before the hearing.

22       MR. THOMAS:  Yes.

23       MR. HARTMAN:  I think the Court was alluding to any

24  other motion or discovery items that he wants to deal with

25  needs to be done within 30 days from today.

-160-

1  will consider that.  You will have to respond to that.  Do you

2  understand that?

3          MR. THOMAS:  Yes, Your Honor.  And I thank you for

4  giving me the time to do what I need to do and to get the

5  judgment in California set aside.  I'm working on that now.

6  There's a lot going on right now, Your Honor.  I had to file

7  documents with the Supreme Court this morning.

8          THE COURT:  That's fine.

9          MR. THOMAS:  So I have -- there's -- this is not the

10  only case.  I have to --

11          THE COURT:  Supreme Court of California?  Supreme

12  Court of the United States?

13          MR. THOMAS:  Supreme Court -- the United States

14  Supreme Court.  So --

15          THE COURT:  And that is -- I'm trying to think.  Is

16  that in your California -- I'm trying to think which case that

17  is.

18          MR. THOMAS:  That's this case, Your Honor.

19          THE COURT:  This case, okay.

20          MR. THOMAS:  That's the Kenmark case --

21          THE COURT:  Yeah, Kenmark case.

22          MR. THOMAS:  -- that I filed to appeal the Ninth

23  Circuit court.

24          THE COURT:  Right.

25          MR. THOMAS:  So I had to file some documents with the

1    Supreme Court today.

2              THE COURT:  Okay.

3              MR. THOMAS:  So -- and I need to file my motion and

4    my judicial notice of documents in California in Santa Clara.

5    So I'm also doing that, and I have to get -- and I'm trying to

6    get that done, but Mr. Morrissey's been holding us up on a

7    declaration that he promised --

8              THE COURT:  Now, Mr. Morrissey is the disbarred

9    lawyer that you work with?  Who's Mr. Morrissey?

10             MR. THOMAS:  Mr. Morrissey was my attorney that the

11   state bar sent the notice to saying that he was not allowed to

12   put the settlement on record.  The day before, Your Honor, he

13   was notified by the state bar, saying that he was not allowed

14   to go forward with the trial.

15             THE COURT:  Mr. Morrissey is the lawyer you were

16   using who has been disbarred.

17             MR. THOMAS:  This was the attorney that was -- that

18   admitted to fraud in 2017, him and Mr. Machado pled to fraud.

19   And after that, I got Mr. Machado to give a declaration stating

20   that they told me that I was not responsible for the settlement

21   and that Mr. Gardner was taking 100 percent.

22             THE COURT:  Well, I don't have that in front of me.

23   I don't think that, but --

24             MR. THOMAS:  That declaration was filed with the

25   Ninth Circuit court.

-162-

1          THE COURT:  That's great.

2          MR. THOMAS:  Okay.

3          THE COURT:  This is the lawyer who you have had here

4  occasionally who is a disbarred lawyer.  Is that correct?

5          MR. THOMAS:  Mr. Morrissey --

6          THE COURT:  Answer my question, yes or no.

7          MR. THOMAS:  No.

8          THE COURT:  Mr. Morrissey is not disbarred?

9          MR. THOMAS:  Mr. Morrissey is disbarred and has a

10 felony against him.

11         THE COURT:  Okay.

12         MR. THOMAS:  Okay.

13         THE COURT:  That's all I'm asking you.

14         MR. THOMAS:  And he was my original attorney who was

15 suspended by the state bar, but he never told me he was

16 suspended.  So --

17         THE COURT:  Well, I'm sorry about that, but --

18         MR. THOMAS:  And he -- well, he also put this

19 judgment that you -- that I had to take all the way up to the

20 Supreme Court on the record after the state bar told him he

21 couldn't, so that he committed a fraud on the court, and I

22 presented those documents to you.

23         THE COURT:  He didn't commit a fraud on me.

24         MR. THOMAS:  I know, not on you, in the Santa Clara

25 case.  They put -- he abandoned me and then --

-163-

1          THE COURT:  But we're not --

2          MR. THOMAS:  -- put it onto the record.

3          THE COURT:  That's not the issue here.

4          MR. THOMAS:  Well, I'm just --

5          THE COURT:  That's not the issue here.

6          MR. THOMAS:  -- I'm just making the record clear,

7    Your Honor, that --

8          THE COURT:  No, no.  You're not making the record

9    clear.  You told me that you have something you're asking to

10   file with the Supreme Court to set aside --

11         MR. THOMAS:  That's a different case.  I put the --

12   the Supreme Court is to set aside your judgment.

13         THE COURT:  That's fine.

14         MR. THOMAS:  Okay.  And the Santa Clara County case

15   is to set aside the fraud that was procured against me in Santa

16   Clara by telling me that I was responsible for the judgment,

17   and Mr. Gardner was going to take full responsibility.  And

18   then, a year and a half later, they tell me that I had to pay

19   because he skipped the country, so --

20         THE COURT:  Well, I'm not involved in that case.

21         MR. THOMAS:  But you are, to some point, Your Honor,

22   because you lifted the stay, and I had asked you not to lift

23   the stay.  And on the record, you said that you were not

24   lifting the stay so that they could get fraud against me.  You

25   said that specifically on the record in the transcript.

-164-

1          THE COURT:  I didn't look at that.  I have no

2     recollection.

3          MR. THOMAS:  And then, you did the exact opposite.

4     You used that fraud against me, and then you said because I had

5     the fraud against me, you had the right to be biased against

6     me, which is what you said on the record.

7          THE COURT:  I don't have the right to be biased

8     against you.

9          MR. THOMAS:  You said that.  You said, I have the

10    right to be biased against you because --

11         THE COURT:  I have the right to take --

12         MR. THOMAS:  To think that --

13         THE COURT:  -- into account --

14         MR. THOMAS:  You said you had the right to think that

15    I was dishonest because I pled to fraud in San Jose --

16         THE COURT:  Yes.

17         MR. THOMAS:  -- which I did not.  And I said on the

18    record --

19         THE COURT:  Well, the record says you did.

20         MR. THOMAS:  No, the record does not.  It says all

21    parties are agreeing to no wrongdoing.  It says it twice.  And

22    the judge, in itself, says that, "In my findings of facts, I am

23    finding that there was no wrongdoing."

24         THE COURT:  Okay.  So, Mr. Thomas, when you come

25    back, you need to focus on the things that are in front of me.

-165-

1          MR. THOMAS:  Yes.  But all those have been in --

2          THE COURT:  Stop.  Rehashing things that aren't

3   applicable to this case, such as whatever you're doing with the

4   Supreme Court, that will happen.  Issues you've got with other

5   people, you can deal with those.  You need to focus.  You're

6   going to do a much better job for yourself here if you focus on

7   this case and the various things we've discussed this morning.

8   That's what you need to focus on here.

9          I know you have other issues elsewhere.  I know

10  you're taking care of the other issues elsewhere.  But those

11  issues don't impact what's happening in this court right now.

12  Do you understand that?  And the more you focus on what's

13  happening here, no matter how much you dislike me or dislike

14  what other people have done or unhappy with what your prior

15  lawyers did, what you need to focus on is what's happening in

16  the bankruptcy court here because that's -- this is where this

17  diamond -- or this emerald is going to be sold or not sold.

18          MR. THOMAS:  Yes.

19          THE COURT:  All right.  So --

20          MR. THOMAS:  And I would like to correct the record,

21  Your Honor.  It's not -- you said that I don't -- that I

22  dislike you.  That's not the case at all.  I respect you, Your

23  Honor, as a judge.  I just think that the rulings that you've

24  made in a lot of the cases don't go according to the law, and I

25  have that right, and that's why I've appealed those cases.

~166~

1           THE COURT:  Well, you certainly have that right, and
2   I disagree with you.  But it's not uncommon for people to
3   disagree with a judge, at least one party.  So no problems with
4   me.
5           MR. THOMAS:  But I don't have any hard feelings to
6   you as a person or as a judge.  I just -- it is the rulings.  I
7   think that, you know, my experience that there's been times
8   where you do not follow the rules and the law.  And by citing
9   California law stating --
10          THE COURT:  And we disagree, and you're certainly --
11  you are certainly able to appeal.
12          MR. THOMAS:  And that --
13          THE COURT:  And I'm not slightly offended by somebody
14  appealing or trying to overrule my decisions.  It doesn't
15  happen -- I mean, most of them aren't overruled, but people
16  object sometimes, and I'm occasionally wrong.  So we'll see.
17          MR. THOMAS:  Okay.
18          THE COURT:  All right.  So --
19          MR. THOMAS:  Thank you, Your Honor.
20          THE COURT:  Mr. Hartman.
21          MR. HARTMAN:  Yes?
22          THE COURT:  I would like you, please -- and I know I
23  have not made this easy -- to do an order as to when various
24  things have to be filed, when things will be heard, if there
25  are other things that need to be addressed.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1       Mr. Thomas.

2       MR. THOMAS:  Yes?

3       THE COURT:  Mr. Hartman will send you a copy.  Do you

4   have a -- you have email.  I'm assuming you have email.

5       MR. THOMAS:  Yes.

6       THE COURT:  Do you have email?

7       MR. THOMAS:  Yes.

8       THE COURT:  Mr. Hartman will send you, by email, a

9   draft of that order.  If you don't agree with it, Mr. -- tell

10  Mr. Hartman that or email Mr. Hartman that, and I will get the

11  two of you on the phone, or if you want to be in court, on the

12  phone, but I will get you on the phone or in court or by video

13  within 24 hours in a working week and we'll get that resolved

14  so we can go forward because we need to go forward and get this

15  case resolved, one way or the other.

16      MR. THOMAS:  Thank you, Your Honor.  And I would like

17  to have one more request.  Could I fax file?  Because it makes

18  it extremely hard when I'm in California and I've got to come

19  all the way up here to file documents to get them stamped, and

20  if you could make it available to me so that I could fax file

21  or email the court the documents so that I could get them on

22  the record without having to come all the way up here and bring

23  three copies and get them stamped.  It's a lot with the cases

24  that -- all the cases I have going on right now, and it's very

25  burdensome on me to not be able to file with this court like

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1   Mr. Hartman can.  He can file through --

2           THE COURT:  ECF, but --

3           MR. THOMAS:  Yes.

4           THE COURT:  But the answer to that is I honestly

5   don't know.  I don't know -- I mean, I do not have any personal

6   opposition to that, but I don't know if the court has the

7   ability to fax file anymore.  I know it did at one point, but

8   it -- that fax is a long time ago, in my experience, and I

9   don't know if there are -- I don't know what the prohibitions

10   or limitations are on basically non-lawyers filing.  But I'm

11   going to ask the  -- Ms. Starzyk or perhaps someone else in the

12   office to see.

13           THE CLERK:  Your Honor, he can file it through the

14   mail.

15           THE COURT:  Okay.

16           THE CLERK:  And you do have the discretion to allow a

17   pro se debtor to file via fax.

18           THE COURT:  Okay.

19           THE CLERK:  It's your discretion since there are ways

20   around it.

21           THE COURT:  So --

22           MR. THOMAS:  And that's what I had asked --

23           THE COURT:  Just a second.

24           MR. THOMAS:  Yes.

25           THE COURT:  So, Mr. Hartman, do you have any issues

-169-

1 with him -- with Mr. Thomas filing by fax?

2          MR. HARTMAN:  Not at all, Your Honor.  It's --

3          THE COURT:  Okay.

4          MR. HARTMAN:  Historically, the volume of the

5 materials that he files will make it burdensome on everybody,

6 but fax is certainly available.

7          THE COURT:  I will allow you to file by fax.  I don't

8 know that you had asked before.  I don't see any reason why you

9 can't file by fax.  You're going to have a big phone bill, I

10 suspect, from the amount of stuff you're faxing, but you can

11 certainly do that.

12          MR. THOMAS:  Is there an e-service that I can file

13 like Mr. Hartman is filing to make it easier so that I can use

14 that process to file through instead of doing the fax?

15          THE COURT:  To be honest with you, I do not know.

16 Why don't you -- let's -- Ms. Starzyk, could you check?

17          THE CLERK:  Yes, Your Honor.

18          THE COURT:  Okay.  So just hang on for a second.  I

19 honestly don't know the answer to the question.

20          MR. THOMAS:  Okay.

21          MR. HARTMAN:  So do we have March 22nd as a hearing

22 date?

23          THE COURT:  We have March 22nd as a hearing date.

24          MR. HARTMAN:  And that is a Friday, right?

25          THE COURT:  I believe -- yeah, I think it's a Friday.





47

1  goes wrong.

2          MR. THOMAS:  Okay.

3          THE COURT:  I, myself, have never personally done

4  that, so I can't really give you a great deal of information on

5  it, but it is something that's on the web page.

6          MR. THOMAS:  Okay.

7          THE COURT:  Okay.

8          MR. THOMAS:  Thank you, Your Honor.

9          THE COURT:  Thank you very much.  Thank you.

10          MR. HARTMAN:  Thank you, Your Honor.

11          THE COURT:  We'll be in recess.

12          MS. COPPA-KNUDSON:  Thank you, Your Honor.

13          THE CLERK:  All rise.

14      (Proceedings concluded at 11:24 a.m.)

15                    *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC  1-855-USE-ACCESS (873-2223)

48

1 **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter.

7

8

9

10 *Alicia J. Jarrett*

11 ALICIA JARRETT, AAERT NO. 428      DATE:   January 9, 2019

12 ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

# EXHIBIT 11

Excerpts from Transcript of Hearing

2-22-2019

# EXHIBIT 11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

IN RE:

ANTHONY THOMAS and
WENDI THOMAS,

                    Debtors.

.  .  .  .  .  .  .  .  .  .  .  .  .

Case No.   14-50333-btb

Chapter 7

300 Booth Street
Reno, NV  89509

Friday, February 22, 2019
3:06 p.m.

TRANSCRIPT OF STATUS HEARING RE: MOTION TO SELL FILED BY
JEFFREY L. HARTMAN ON BEHALF OF JERI COPPA-KNUDSON [430]
**BEFORE THE HONORABLE BRUCE T. BEESLEY
UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Chapter 7
Trustee:

Hartman & Hartman
By: JEFFREY L. HARTMAN, ESQ.
510 West Plumb Lane, Suite B
Reno, NV 89509
(775) 324-2800

TELEPHONIC APPEARANCES:

For the Debtors:

ANTHONY THOMAS (Pro Se)
7725 Peavine Peak Court
Reno, NV 89523
(775) 229-4503

Audio Operator:

I. Starzyk, ECR

Transcription Company:

Access Transcripts, LLC
10110 Youngwood Lane
Fishers, IN 46038
(855) 873-2223
www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

-174-

4

1   get that document that you have received into evidence.

2           MR. THOMAS:  Your Honor, I'd like to thank you, for

3   one, for stating that to me, and I'd like to also thank you for

4   acknowledging that I do have a disability and that it does take

5   me a little more time because I did not study law like

6   Mr. Hartman and you throughout your career, and it's taken me a

7   little bit longer to grasp, you know, the procedural things and

8   the things that I need to go through.  But I am aware that 14

9   days before the 22nd, I will file all that evidence, the

10  documents, and do that through my adversary complaint to

11  Mr. Hartman, and I will have that filed 14 days ahead of time.

12          So that's one part of the issue.  The second part is

13  that you asked me to subpoena Stremmel Auctions, which I did.

14          THE COURT: No, no, I did not ask you to subpoena

15  Stremmel Auctions.  You indicated that you were going to depose

16  Mr. Stremmel and you were going to do research.  I didn't tell

17  you to -- I don't believe I told you to subpoena them, but you

18  were certainly able to do that.

19          MR. THOMAS:  Right.  Well, you said that I did have

20  the right to do it, and under, you know, the last minute, you

21  said that I could subpoena him, which I did follow your

22  instructions and I subpoenaed Mr. Stremmel.  Mr. Stremmel

23  supplied me with 50 pages of documents.  I Bates stamped all

24  the documents and requested that Mr. Stremmel acknowledge that

25  those are the documents that he sent to me.  I sent him five

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1   separate emails, asking Mr. Stremmel to acknowledge that these
2   are the documents that I received, and he's refused to respond
3   to that under the subpoena.
4            THE COURT:  Well --
5            MR. THOMAS:  And he also did not comply with the
6   subpoena because he did not send me all the documents that I
7   requested, and he -- the documents that he did send me do not
8   support his declaration, which --
9            THE COURT:  So just wait, just wait.  I'm not
10  deciding anything at this status hearing, so you will need to
11  -- you can file a motion to compel to compel Mr. Stremmel to
12  produce documents that you didn't -- that you think he did not
13  produce.  We will have a hearing on that.  Mr. Stremmel will
14  have to appear, and he will have to file a response to that,
15  and we'll have a hearing on that.  So that's how we'll deal
16  with this.
17           So with respect to the documents you got from
18  Mr. Stremmel, you need to figure out how to get those into
19  evidence, following the rules of evidence.  Understand?
20           MR. THOMAS:  Yes.
21           THE COURT:  Okay.
22           MR. THOMAS:  Yes.
23           THE COURT:  So you can't -- again, you can't tell me
24  what Mr. -- what -- basically, what Mr. Stremmel told you.
25  He's not a party to this action.  If you want to get

-176-

6

1  information from him that's -- can be put in, you can do a

2  deposition of him or you can call him as a witness.  You would

3  have to pay him a witness fee for doing that, and you would

4  have to subpoena him to the Court.  So you'll have to do that

5  at the hearing next month if you want him -- if you want that

6  information in.

7          MR. THOMAS:  Okay.  Yes, I do want that information

8  in, Your Honor, and I will figure out the proper procedures to

9  make sure that happens.  But I also want this Court to know

10  that in the documents that Mr. Stremmel did provide, they

11  didn't support his declaration.

12          THE COURT:  Well, that's --

13          MR. THOMAS:  And --

14          THE COURT:  -- that's not -- Mr. Thomas?

15          MR. THOMAS:  Yes.

16          THE COURT:  That's argument.  You need to establish

17  that through by evidence -- I'm not telling you what you have

18  to do, but at a minimum, you would have to get Mr. Stremmel

19  here, get him on the stand, go through what his declaration

20  was, and try and impeach him on what was represented in his

21  declaration through whatever means you have.

22          MR. THOMAS:  Yes.  Can I get this Court to make -- to

23  put an order to get Mr. Stremmel to comply?  Because he didn't

24  comply to the subpoena.

25          THE COURT:  You would have to file a motion with the

1   Court requesting to show cause why he did not file -- why he

2   did not comply with the subpoena, and he would have a chance to

3   respond to that.

4            MR. THOMAS:  Okay.  Okay.  I will get that filed

5   immediately, and then I will try to set a time with

6   Mr. Stremmel to take his deposition, and I will try to get --

7            THE COURT:  You don't have to take his deposition.

8   You can -- I mean, you can -- if he will talk to you, you can

9   speak -- you can talk to him.  He's not a party.  If you want

10  to just subpoena him to come to Court and testify, you can do

11  that, too.  You don't have to depose him ahead of time, but

12  many lawyers will do that.

13           MR. THOMAS:  I would like to depose him ahead of time

14  so that we could have it on the record prior to coming into

15  court because I have asked Mr. Stremmel to acknowledge that

16  these are the -- there was 50 documents that he gave to me, and

17  I Bates stamped the documents.  I scanned them back -- I

18  scanned them and sent them back to him and asked him to

19  acknowledge that these are the documents that I received from

20  you.

21           THE COURT:  That's --

22           MR. THOMAS:  And I sent him five --

23           THE COURT:  That has no impact at all.

24           MR. THOMAS:  Well, I don't want Mr. Stremmel to say

25  that they weren't the documents that he sent to me under the

-178-

1    subpoena.   I want him to acknowledge that these are the

2    documents because he sent me receipts, Your Honor, for only

3    $234, and he turned in, in his declaration, fees for close to

4    $1,200.   So I want to know that these are all the documents.

5              THE COURT:   Well, you need -- well, one, you can call

6    him and make -- and ask him.   Secondly, the mechanism you

7    suggested is probably not useful.   You would need to have him

8    come to the witness stand and testify and show him the

9    documents that he received and that he sent to you and ask him

10   if there were other documents.   That's how you would do this.

11   Or you could do that in a deposition prior to the time of the

12   trial.

13             MR. THOMAS:   Okay.   I would like to try to do it in a

14   deposition prior to the time to move forward.   And there's one

15   other issue, Your Honor, that I would like to understand a

16   little bit more.   You know I have a disability.   For some

17   reason, when I'm talking, there's a huge echo in the

18   background.   Can we clear that up?

19             THE COURT:   The -- my answer to that is I don't know,

20   but we'll try.   Do you have us on a speakerphone?

21             MR. THOMAS:   Yes, I do.

22             THE COURT:   If you would take us off the

23   speakerphone, that would be helpful.

24             MR. THOMAS:   Okay.   I'll do that.

25             THE COURT:   Okay.

1           MR. THOMAS:  Is that -- is -- let's see here -- it

2    was on my car phone, so that's why.

3           THE COURT:  That's fine.  That happens.  That should

4    help.

5           MR. THOMAS:  Okay.  So, yes, the echo has slightened.

6    But I appreciate you acknowledging that I have a disability,

7    and I thank you for working through my struggles to get through

8    this.  But, Your Honor, I would like to do a deposition of

9    Mr. Stremmel, but my first question to the Court, Your Honor,

10   is that under the rules that I've read and under Rule 363(b)

11   under the Bankruptcy Code and Rule 6004 and Rule 2002, I don't

12   believe that the Court was able -- is able to even go forward

13   because they didn't comply with the rules to give 21-day notice

14   to all parties --

15          THE COURT:  But you --

16          MR. THOMAS:  -- before the sale.

17          THE COURT:  Mr. Thomas, more than 21 days has passed

18   and you've had enough notice and the sale hasn't occurred.  So

19   there's --

20          MR. THOMAS:  But -- I understand that, Your Honor,

21   but the rules were not followed properly according to the rules

22   in the rule book.

23          THE COURT:  Your objection is --

24          MR. THOMAS:  And I think that --

25          THE COURT:  Mr. Thomas, Mr. Thomas, stop, please.

- 180 -

1  Your objection is overruled. They can go forward with the sale.
2  You have had adequate notice.  And I believe, when I counted it
3  up, that there was 21 days' notice, but I'm not going to
4  quibble with you about that because the purposes of having
5  notice times is so that people have an adequate time to deal
6  with things.  You've had far more than 21 days to deal with
7  this issue, so that objection is overruled.
8       MR. THOMAS:  But, Your Honor, they did not notify all
9  the creditors.  They also have to be --
10       THE COURT:  That -- I don't know that they -- you
11  said they didn't notify any of the creditors.  I looked at the
12  notice.  They noted there's several pages, there's something
13  like 85 or 90 creditors that were notified.
14       MR. THOMAS:  Your Honor, nowhere on the docket does
15  it show that the clerk mailed out notice to anybody, and under
16  the rules --
17       THE COURT:  Stop.  Stop.
18       MR. THOMAS:  -- the notice is supposed --
19       THE COURT:  Stop.
20       MR. THOMAS:  -- to be sent out by the --
21       THE COURT:  Stop.  So there is a -- hang on here.  So
22  if you look at -- there was a notice of hearing, I think it's
23  Document 456, and there is a cert of service, Document 457.
24  Now, Document 457 has several pages attached to it, -- is this
25  the right thing?  I'm sorry, that's the wrong one.

-181-

1    Mr. Hartman, can you tell me what the correct docket

2 number is?

3    MR. HARTMAN:  I don't have that file in front of me,

4 Your Honor, but I think I can help the Court.

5    THE COURT:  Sure.

6    MR. HARTMAN:  This issue is not part of the status

7 hearing.  If he wants to object to notice, it can be in his

8 objection to the motion.

9    THE COURT:  And that's correct.

10    MR. HARTMAN:  That's where it belongs.

11    THE COURT:  And that's true, Mr. Thomas.  You can

12 file an objection to the notice, but in preparing for this

13 hearing, I do believe that the hearing was noticed properly.

14    MR. THOMAS:  Your Honor, I --

15    THE COURT:  No, nope.  File an -- Mr. Thomas, file an

16 objection.

17    MR. THOMAS:  I --

18    THE COURT:  File an objection.  File an objection.

19    MR. THOMAS:  I will file an objection.  I --

20    THE COURT:  No, no, don't talk.  File an objection.

21    MR. THOMAS:  Your Honor ,I would -- I'd just like to

22 make a record that I've already stated several times that I

23 have reviewed the docket and nowhere on the docket -- I said

24 this to you before -- is there a notice to the creditors or to

25 myself with the 21-day notice, and that is a violation of the

1 rules.

2         THE COURT:  File a motion.

3         MR. THOMAS:  And --

4         THE COURT:  File a motion.

5         MR. THOMAS:  I will file a motion, but I just wanted

6 to make the Court aware --

7         THE COURT:  Stop talking.  Stop talking.

8         MR. THOMAS:  Your Honor, why do you object to me

9 making a clear record every time.  You know that I have a

10 disability.  You know that I have a disadvantage because I

11 never practiced law like you and Mr. Hartman and that I'm here

12 on my own, trying to represent myself when I clearly asked the

13 Court to give me assistance for my disability, and you've

14 refused.  And under the law that I turned in to the Court, I'm

15 entitled to assistance for my disability.  And so I think that

16 you're depriving my constitutional rights and --

17         THE COURT:  Then --

18         MR. THOMAS:  -- and -- by Mr. Hartman and this Court

19 not following the rules.  These are simple rules that I was

20 able to look up in the portable Bankruptcy Code for rules and

21 procedures.  And if you can tell me that I'm reading this wrong

22 and state to a different code procedure, then I'm more than

23 happy to look at that.  If, you know, somebody can show me, you

24 know, under a law or under a rule that you guys are complying

25 with the rules, I'm more than happy to look at that.  But

-183-

1  Mr. Hartman has not been able to show on the docket that it was
2  sent out and nor have you been able to show on the docket where
3  it was properly noticed and sent out by the clerk, and that's
4  part of the rules.

5          MR. HARTMAN:  Your Honor --

6          MR. THOMAS:  So we shouldn't even be able to go
7  forward at all without those procedures being followed, and
8  that's what I'm saying.  Why are we wasting all this Court's
9  time and my time when the procedures under the law weren't
10 followed?  I have constitutional rights.

11         THE COURT:  Stop, Mr. Thomas.

12         MR. THOMAS:  And this is the United States of
13 America.  We're supposed to go by the rule of law.

14         THE COURT:  So please mute Mr. Thomas.

15         MR. THOMAS:  And in this court, over time and time
16 and time again, you know, my rights have been taken away.

17         THE COURT:  Mr. Thomas, I don't think -- I have muted
18 you so you will listen.  I don't believe your constitutional
19 rights have been violated.  I don't believe that there's been
20 any action by opposing counsel or this Court which has, in some
21 manner, illegally impeded you.  I have not found and you have
22 not presented to me any case law or statutory law that says I
23 am supposed to assist you in some way because you have
24 dyslexia.  I understand that's a difficult condition to have,
25 and I certainly am sympathetic with that, but I'm not required

-184-

1  by any law that you have provided me or any case law that

2  you've provided me that I have to do that.  I'm -- the -- from

3  what I can tell, you've had three attorneys, all of whom

4  withdrew because they said they couldn't get along with you in

5  the sense that they were not -- you were not willing to follow

6  their advice on how to prosecute this matter.  So you will need

7  to get together your exhibits.  You will need to subpoena

8  witnesses.  You will need to do depositions if you need to go

9  forward.

10         Mr. Hartman, do you have anything to add?

11         MR. HARTMAN:  Yes, I do, Your Honor.

12         THE COURT:  Please.

13         MR. HARTMAN:  The order that we referred to earlier,

14  which is Docket Entry 451, on Page 2 at Lines 21 and 22, says

15  "Copies of all papers obtained in connection with discovery

16  must be provided to trustee's counsel."  Mr. Thomas hasn't

17  provided me with copies of his subpoenas or anything that he

18  received from Mr. Lamberski (phonetic) or anybody else.  So I'm

19  reserving the right to object to any evidence that he might

20  want to submit.

21         THE COURT:  So, Mr. Thomas, I hope you're listening.

22  You have not complied with the Court's order.  Mr. Hartman can

23  object.  You might be able to mitigate that if you were to

24  promptly provide him with the documents you have received, and

25  I would consider that if there's an objection at the time of

-185-

1  the trial.

2        What else, Mr. Hartman?

3        MR. HARTMAN:  Your Honor, more than once at a prior

4  hearing, Mr. Thomas wanted to take the deposition of

5  Mr. Stremmel.  Rule 2004 is the procedure for doing that in

6  advance of the hearing if he chooses to do so, but it's not --

7  beyond the rules, it's not my responsibility to make sure that

8  he's aware of what he can do.

9        THE COURT:  It is not your responsibility.  And

10  besides that, the time to do further discovery passed on

11  February 19th, so he cannot take the deposition of

12  Mr. Stremmel.  That was the order that was entered --

13        MR. HARTMAN:  On --

14        THE COURT:  -- on the hearing date, June 8th [sic].

15        MR. HARTMAN:  That was the order entered on January

16  17th.

17        THE COURT:  I'm sorry, I misspoke, in January.

18        MR. HARTMAN:  Yes, Docket 451.

19        THE COURT:  So please put Mr. Thomas back on.  No, so

20  he can speak.

21        THE CLERK:  Yes.  He should be on.

22        THE COURT:  Mr. Thomas?

23        MR. THOMAS:  Yes, Your Honor.  Nobody has still

24  answered my question.  Where on the docket does it show that

25  the notice went out properly according to the rules?  What

-186-

1  docket number is that, and where is the notice that was sent

2  out by the clerk?  And -- nobody's answered that question.  And

3  how we are -- how are we able to proceed forward when the clerk

4  has not complied with the rules?

5        THE COURT:  Mr. Thomas, you have been served with all

6  of the notices that have gone out.  I reviewed them earlier

7  today, and if I can find them, I will tell you.  There was a

8  notice of hearing on motion for order confirming sale by

9  auction.  The hearing date was originally January 8th.  I do

10 not have the file stamp on it, but it's in the file.  You were

11 noticed at AT Emerald at 7725 Peavine Peak Court, Reno, Nevada

12 89523.  I believe you and your wife were also noticed on that.

13 There's about 85 addresses that are on this.  That was sent

14 out.  There is --

15        MR. HARTMAN:  Your Honor, I believe Mr. Thomas's

16 email address is also on the certificate of service.  That's

17 how he asked to be served.

18        THE CLERK:  Your Honor, the certificate of service is

19 Docket Number 435.

20        THE COURT:  Docket 435.  Let me see if I can find it.

21        THE CLERK:  Would you like me to print it for you?

22        THE COURT:  No, I have it printed here.  I'm just

23 looking for the -- I know he was served at AT Emerald.  I know

24 that he was served at his home or went to his address.

25        MR. HARTMAN:  It's usually before the matrix or after

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

1  the matrix, Your Honor.

2          THE CLERK:  And the --

3          MR. HARTMAN:  Because it's separate.

4          THE CLERK:  And a copy of the matrix is attached, and

5  the matrix indicates 85 parties.

6      (Court and clerk confer)

7          THE COURT:  Sorry, this is the notice of hearing.

8          THE CLERK:  That's the notice of hearing.  I'll print

9  the cert of service.

10          MR. HARTMAN:  Again, Your Honor, if there's an

11  objection --

12          THE COURT:  No, I have a cert of service right here.

13          MR. HARTMAN:  -- to the notice --

14          THE CLERK:  Do you have it?

15          THE COURT:  Yeah, right here.

16          THE CLERK:  Okay.  It should be seven pages, Your

17  Honor.

18          THE COURT:  This?

19          THE CLERK:  Yes.

20          THE COURT:  Yeah.  Okay.

21          THE CLERK:  And that was filed on December the 3rd.

22          THE COURT:  So this was filed on December the 3rd,

23  Mr. Thomas.  As I indicated, you were on the service list.  You

24  were served by U.S. mail.  You were also electronically served

25  -- you were also served electronically at ATEmerald2@gmail.com.



1  So you've had notice.

2           MR. THOMAS:  Your Honor ,that notice was after the

3  sale.  The sale took place on November 15th and went -- was

4  from October 30th to November 15th, so that was notice after

5  the sale.  Notice is supposed to be --

6           THE COURT:  Mr. Thomas, stop.

7           MR. THOMAS:  -- 21 days prior to the sale.

8           THE COURT:  Mr. Thomas, Mr. Thomas, stop.  You can

9  bid at the sale and purchase this emerald if you are a higher

10  bidder than the current bid.  It was a stalking horse bid.  You

11  have been told that many times.  If you come forward with cash

12  money more than somebody else wants to pay for it, you can buy

13  this emerald.  The sale is not complete.

14           MR. THOMAS:  I understand that, Your Honor, but under

15  the rules, the Court and Mr. Hartman have not complied under

16  the rules.  And the sale

17           THE COURT:  Then, you should take -- then you should

18  file --

19           THE COURT:  Then, when this case is over, or if now,

20  you should file an appeal.  Okay.  We're done.  See you next

21  week.

22           MR. HARTMAN:  Thank you, Your Honor.

23           THE CLERK:  All rise.

24      (Proceedings concluded at 3:33 p.m.)

25                         *  *  *  *  *

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

19

1          **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9

10  _____

11  ALICIA JARRETT, AAERT NO. 428      DATE:  March 3, 2019

12  ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

**EXHIBIT** <u>12</u>

Excerpts from Transcript of Hearing
3-6-2019

**EXHIBIT** <u>12</u>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

|  |  |  |
|---|---|---|
| | . | Case No.   14-50333-btb |
| IN RE: | . | |
| | . | Chapter 7 |
| ANTHONY THOMAS and | . | |
| WENDI THOMAS, | . | 300 Booth Street |
| | . | Reno, NV  89509 |
| Debtors. | . | |
| | . | Wednesday, March 6, 2019 |
| . . . . . . . . . . . . . | . | 10:12 a.m. |

TRANSCRIPT OF NOTICE OF INTENT TO ABANDON FILED BY
JEFFREY L. HARTMAN ON BEHALF OF JERI COPPA-KNUDSON [454]
**BEFORE THE HONORABLE BRUCE T. BEESLEY**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Chapter 7         Hartman & Hartman
Trustee:                  By: JEFFREY L. HARTMAN, ESQ.
                          510 West Plumb Lane, Suite B
                          Reno, NV 89509
                          (775) 324-2800

TELEPHONIC APPEARANCES:

For the Debtors:          ANTHONY THOMAS (Pro Se)
                          7725 Peavine Peak Court
                          Reno, NV 89523
                          (775) 229-4503

Audio Operator:           I. Starzyk, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

-192-

1      (Proceedings commence at 10:12 a.m.)

2          THE COURT:  Next case I'm calling is <u>Anthony Thomas</u>

3  <u>and Wendi Thomas</u>, 14-50333.  Appearances, please.

4          MR. HARTMAN:  Jeff Hartman for trustee, Your Honor.

5  Jeri Coppa-Knudson is also present.  I'm sure this one will

6  only take a few minutes, right?

7          THE COURT:  Okay.  I didn't think it'd take long.

8          Mr. Thomas, are you on the phone?

9          MR. THOMAS:  Yes, Your Honor.

10          THE COURT:  Okay.  Before we get into this, I've been

11  advised that your daughter is singing at Carnegie Hall this

12  week or tonight.

13          MR. THOMAS:  Yes, this week.

14          THE COURT:  Well, congratulations to her,

15  particularly, but also congratulations to you.  That's quite an

16  achievement.

17          MR. THOMAS:  Thank you, Your Honor.

18          THE COURT:  Certainly.

19          MR. THOMAS:  It is quite an achievement, and I'm

20  honored.  Thank you.

21          THE COURT:  Certainly.

22          Mr. Hartman.

23          MR. HARTMAN:  Your Honor, this is the trustee's

24  request for an order authorizing the abandonment of the Portola

25  property.

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

3

1          THE COURT:  Okay.  Mr. Thomas, do you have any -- I
2  wouldn't think you'd have an opposition to that, but do you
3  have any opposition to this?

4          MR. THOMAS:  I don't, Your Honor, but there's a few
5  things that I would like to clear up first, that I was cut off
6  at the last hearing.  And --

7          THE COURT:  I'm listening.

8          MR. THOMAS:  Yes.  I was cut off at the last hearing,
9  and I didn't get to get these issues on the record.

10          THE COURT:  Well, then -- Mr. Thomas, just wait.  The
11  only issue that is before me right now is the abandonment of
12  the Plumas, California property to you, or to your parents, I
13  guess, because it's noted to him and you -- to you.  So that's
14  the only thing I have on calendar.  If you want to address
15  matters that you didn't think you got to address previously,
16  you need to file a motion and you need to set a hearing so that
17  that gives trustee's counsel, if they want, time to reply or
18  oppose or indicate they don't have any opposition.  So that's
19  what you're going to have to do if you want to address those
20  issues.

21          MR. THOMAS:  Well, these issues are regarding my
22  constitutional rights, Your Honor, and --

23          THE COURT:  Well, then --

24          MR. THOMAS:  -- going forward.

25          THE COURT:  -- Mr. Thomas, Mr. Thomas, Mr. Thomas, if

-194-

4

1  you want to address your constitutional rights, you need to put

2  your constitutional rights in the form of a pleading, address

3  which they are.  You would file it with the Court.  The trustee

4  and her counsel would have the chance to oppose it, not oppose

5  it, do what needs to be done, and we'll have a hearing on it.

6          MR. THOMAS:  Okay.

7          THE COURT:  So that's what you need to do to address

8  your constitutional rights is give, in written pleading, what

9  they are and how they have been violated.

10         MR. THOMAS:  Thank you, Your Honor.

11         THE COURT:  Okay.

12         MR. THOMAS:  And can I answer that, Your Honor?

13 Thank you, Your Honor.  And because you've asked me to file

14 these motions in the court, and you've told me before, I want

15 your position to file a civil action against you, Mr. Hartman,

16 and the trustee in an adversary complaint and a declatory

17 relief action and an injunction of stay because I think that

18 all those have been violated, and you're saying that I need to

19 file a motion, and I want your permission to be able to file

20 any civil action that I need to proceed to follow through to go

21 after, you know, Your Honor, Mr. Hartman, and the trustee for

22 violations of my constitutional rights and other violations

23 that I believe this Court has taken away from me in my -- under

24 the Constitution.

25         THE COURT:  As I indicated before, you can file a

~195~

1  complaint.  I'm not giving you permission to name a particular

2  party.  I'm not giving you permission or denying you permission

3  to make certain claims or certain remedies.  You can file what

4  you need to file, and it'll be dealt with by people who are

5  impacted by it.

6          MR. THOMAS:  Okay.  Thank you, Your Honor.

7          THE COURT:  Mr. Hartman.

8          MR. HARTMAN:  Your Honor, the order that I'm going to

9  lodge, of course, is going to -- it will need to be recorded in

10 Plumas County.

11         THE COURT:  Correct.

12         MR. HARTMAN:  And I think I've concluded that

13 Mr. Thomas has not objected to the order of abandonment, so --

14         THE COURT:  I think that's correct.

15         MR. HARTMAN:  -- I don't think I need his signature

16 on the order.  Is that correct?

17         THE COURT:  Mr. Thomas?

18         MR. THOMAS:  I -- my objection was limited that they

19 turn the property over to -- back over to my parents and that

20 they clear the title so that my parents -- it's not burdensome

21 to my parents, and I've also asked Mr. Hartman to clear the

22 record that the property was not transferred for the 200,000 as

23 it is stated on the documents that I filed, and it is also

24 stated in the 341 meeting.  It was clarified what the transfer

25 was for.  And in the hearing, Your Honor, you said that that

-196-

6

1 was not a dispute and that you agreed that that's not what I

2 said, that it was not transferred for 200-. And I asked

3 Mr. Hartman to correct that on the record, and he refused. And

4 you said in the court on the record that that part of it was

5 not disputed and that I did declare the property in the 341

6 meeting and I did declare it in my filings. And I also

7 clarified what amounts were conveyed for the property to my

8 parents.

9         THE COURT:  All the trustee is --

10         MR. THOMAS:  So I want that clear on the record.

11         THE COURT:  No.  All the trustee is going to do is

12 file the document that says the trustee is having the estate

13 abandon any claim it has to that property.  That's what this is

14 going to say.

15         Mr. Hartman, go ahead.

16         MR. HARTMAN:  Your Honor, more specifically, if you

17 recall, the underlying question is the fact that Mr. Thomas's

18 parents --

19         THE COURT:  Right.

20         MR. HARTMAN:  -- got a deed supposedly in 2008 but

21 never recorded it.

22         THE COURT:  Correct.

23         MR. HARTMAN:  So on the petition date, the record

24 title is still in the name of the debtors.

25         THE COURT:  Correct.

-197-

ACCESS TRANSCRIPTS, LLC  1-855-USE-ACCESS (873-2223)

1          MR. HARTMAN:  So the case law that I cited in my

2  reply says you abandon it back to the debtor.

3          THE COURT:  That's my understanding.

4          MR. HARTMAN:  And that's how the order is going to

5  read.

6          THE COURT:  That's my understanding, and that's what

7  needs to be done.

8          So, Mr. Thomas, that's what's going to happen.

9          MR. THOMAS:  Your -- okay.  Your Honor, I would like

10 the trustee and them to uncloud the title on the property

11 because they took the property illegally without a court order.

12 So --

13         THE COURT:  That's not true, Mr. Thomas.  Mr. Thomas,

14 you scheduled the property, I believe, as yours in your

15 bankruptcy, and they are abandoning it back to you.

16         MR. THOMAS:  Your Honor, I filed almost 600 pages of

17 documents, as you know, with judicial notice, which I've asked

18 you to take judicial notice of, and you said on the record that

19 you are not doing my report cards.

20         THE COURT:  I guess --

21         MR. THOMAS:  But I found law under 201, the Federal

22 Rule of Evidence law 201(b), you are required to take judicial

23 notice and you are required to do the checkboxes in my report

24 card, which you've stated on the record several times that you

25 refuse to do, which is abandoning your judicial duties.  You

-198-

1  are required under law to do your judicial administerial

2  duties, and you've refused.  You've told me that you are not

3  going to check the boxes and you're not going to do my report

4  card, and under Federal Rule of Evidence 201(b), you are

5  required to by law to take judicial notice.

6      THE COURT:  I am required to take judicial notice,

7  but I'm not required to do your check-off box.  But here's what

8  we're going to do.  Mr. Hartman is going to file the document

9  abandoning the property.  You are done talking.

10      Mr. Hartman, go ahead.

11      We're going to sever your phone conference right now,

12  Mr. Thomas.  Thank you.

13      MR. THOMAS:  Your Honor, you're going to take away my

14  constitutional rights to --

15      THE COURT:  No, I'm having the phone hung up on you

16  because you're not -- there's nothing before me to look at in

17  your constitutional rights, so I hope you have a good day,

18  Mr. Thomas, and congratulations to your daughter.

19      MR. THOMAS:  Thank you, Your Honor.

20      MR. HARTMAN:  So --

21      THE COURT:  Thank you.

22      MR. HARTMAN:  So am I correct that he doesn't need to

23  sign off on the order?

24      THE COURT:  He does not need to sign off.

25      MR. HARTMAN:  All right.  Thank you.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1          THE COURT:  His signature is waived by court order.

2      (Proceedings concluded at 10:21 a.m.)

3                      *  *  *  *  *

1
2
3
4
5
6

# C E R T I F I C A T I O N

        I, Alicia Jarrett, court-approved transcriber, hereby
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter.

7
8
9
10



11  ALICIA JARRETT, AAERT NO. 428      DATE:  March 14, 2019
12  ACCESS TRANSCRIPTS, LLC
13
14
15
16
17
18
19
20
21
22
23
24
25

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

**EXHIBIT** 13

December 2018 Saratoga Spotlight
Magazine Cover
and Article.

**EXHIBIT** 13

# SARATOGA

*Spotlight*

**DECEMBER 2018**

*Dorothy &*
*Eli Thomas*

**Family Roots and Values**



**Best Version Media**

*Cover photo by Dave Lepori*



# Dorothy & Eli Thomas
## Family Roots and Values

**By Genevieve Laucher**

Family always comes first for Dorothy and Eli Thomas. They often think of their family's roots and the small mining town they grew up in. Their backgrounds helped shape them, and later their children, into the hardworking, caring people that they are.

Both Dorothy and Eli grew up in Butte, Montana. Eli's parents came from Lebanon in 1910, before Lebanon gained independence. They were sponsored at Ellis Island before moving to Montana to peddle and raise sheep, lambs, and vegetables. Eli grew up as the youngest of eleven children. When he was only two years old, his mother sadly passed away from a virus, and his older sisters promised their father that they would raise Eli and the other younger children while their father worked.

The Thomas family opened a store in front of their home with clothing and supplies for the miners, and all of the children worked hard helping in the store. As the store grew more successful, their father moved it into

town. Eli grew up and went to Gonzaga University and then served in the Army. When he returned to Butte, he bought the family store from his father and worked with his sister to expand and update the store. He later let his brother take his share in the growing business, and set out to start his own clothing business in 1957.

At the time, Eli and Dorothy were already dating. Dorothy also grew up in Butte in the Irish part of the community with her parents and two sisters. They were married in 1958, and just celebrated their 60th wedding anniversary! They stayed in Montana with Eli's clothing business for the next six years, where they were fascinated by the mining community and all of the different cultures that came together there. The area was known for its ore, which was shipped on trains all over the U.S. and on boats all around the world. The word spread that there were jobs in Montana for all different people.

Around 1963, Eli began to see mines closing around Butte, and he and Dorothy decided to move west. Eli had boxed throughout his youth and

-204-

*Photos by Dave Lepori*

RESIDENT FEATURE

during his four years at Gonzaga. He was an extremely talented boxer and youth boxing coach, and he got to travel around the country to compete. He was a national champion two years in a row, and he had gotten to known the San Jose State boxing coaches very well.

So when Eli and Dorothy came to the San Jose area in 1964, the boxing coach at San Jose State, Julius "John" Menendez, really reached out. He told Eli how fast the area, and Valley of the Moon, were growing. Additionally, the Town and Country Village across the street, which is where Santana Row stands today, was just being built. Eli first got a job working at a store in Valley Fair. Julie helped introduce Eli to other business owners and form connections, including with the owner of Town and Country Village. With the help from his friend John, who had been his neighbor in Butte, Eli selected a corner for his business, Eli Thomas Menswear, and built out his 4,000 square foot store.

Over the years, the area and the business grew and grew. Eli and Dorothy had six children by that time, all boys. They rented a home in Cupertino for their first two years here before looking to buy a home. Eli's friend John Bjdeich helped them find a new home that was being built at the end of a court by the apricot and walnut orchards in Saratoga. They moved into the home in February 1966 and had their first daughter that November, followed by one more boy and one more girl. They have been in their home ever since, and their nine children loved growing up there.

It was important to Eli that their children worked, since he did as a kid and he saw the value of it, both in the community and at home. Growing up, all nine children worked at the store in various capacities. Eli got involved with the Lebanese community in the area, and found

all of these kids working in the apricot orchards and packing fruit. They also felt and even learned some phrases from the other farm workers. This was the time of Cesar Chavez, and they would come home excited to share their experiences.

The business has been successful for all these years, and to Eli, it came down to treating his customers well. Eli loved what he did and was very involved. It was not until that they moved into five years ago. Besides his store, Eli was also involved with the community in other capacities. Governor Jerry Brown appointed Eli as the commissioner of boxing and wrestling. Eli remained close with coach Julie Menendez, who went on to be the only person to coach the Olympics in two sports, boxing and soccer.

Dorothy also got involved in the community, especially as their children got a little bit older. She was involved with Eastfield Ming Quong in Campbell, which has a home for emotionally disturbed children. The shop The Butter Paddle in Los Gatos is run by volunteers, and all proceeds go towards running the home. Dorothy helped see what the home needed and raise money for it. Dorothy also was involved in the Bellarmine Mother's Guild, and was the chair for the Bellarmine Fashion Show, which supports scholarships. Additionally, Dorothy enjoyed exercising, tap, bowling, and spending time with her friends.

Dorothy and Eli now have sixteen grandchildren. Their children are very successful and they love spending time together. Although their children and grandchildren live all around the country, they come to visit Dorothy and Eli in their home frequently. They spend Thanksgiving together with the whole family, about 40 people! Dorothy and Eli feel very thankful for their history and their present lives together.

Do you know a neighbor who has a story to share?
Nominate your neighbor to be featured in one of our upcoming issues!
Contact us at glepori@innervisionmedia.com

# EXHIBIT 14

21 TORT & INS. LAW. JOURNAL  509
(1986)

Judges Cannot Invoke Judicial Immunity
For Acts that Violate Litigants Civil Rights

# EXHIBIT 14

# TORT & INSURANCE
# LAW JOURNAL

# VOLUME 21

# 1985-1986

# Contents

393    Multiple Policy Period Losses and Liability under
First-Party Policies
*John B. Hook*

407    The Reinsurer's Liability in the Event of the Insolvency
of a Ceding Property and Casualty Insurer
*T. Darrington Semple, Jr., and Robert M. Hall*

425    Punitive Damages in Admiralty
*George L. Waddell*

441    *Ex Parte* Interviews with "Two-Hatted" Witnesses
*David L. Lillehaug*

451    Misrepresentation in the Application as the Basis for
Rescission of a Property Insurance Policy
*Robert J. Brennan and Jane M. Hanson*

464    The Effect of the Current NHTSA Regulations and
Enforcement Policy on Products Liability in the Motor
Vehicle Industry
*Cary Stewart Sklaren*

475    The Case for the Nonapplication of ERISA to Insurers'
General Account Assets
*Stephen H. Goldberg and Melvin S. Altman*

CASENOTE
493    *Kelley v. R. G. Industries:* Gun Control Fires Back
*Steven N. Lippman*

-208-

## CASENOTE

# FEDERAL TORT LAW: JUDGES CANNOT INVOKE JUDICIAL IMMUNITY FOR ACTS THAT VIOLATE LITIGANTS' CIVIL RIGHTS—*DYKES V. HOSEMANN*

*Robert Craig Waters*

Appellant and her husband, residents of Pennsylvania, separated in 1977.[1] That same year, the husband took their only child to his parents' Florida home.[2] The husband's father, a Florida judge, secured a court order purporting to award custody of the child to his son.[3] In violation of state law,[4] a fellow judge issued the order in a summary hearing without notice to appellant.[5] Appellant later filed a federal tort action alleging that the issuing judge had acted without personal jurisdiction[6] as part of a conspiracy[7] to deprive her of her civil rights.[8] Citing judicial immunity, the dis-

---

1. Dykes v. Hosemann, 743 F.2d 1488, 1490 (11th Cir. 1984).

2. *Id.*

3. Appellant argued that her father-in-law conspired with several state officials to obtain a colorable custody order. The defendant-officials were the state juvenile judge who issued the custody order and a state child-welfare officer. In addition, appellant named her husband, her father-in-law and their attorney. *Id.* at 1490-92.

4. FLA. STAT. § 39.09(1) (1977) required a preliminary hearing to determine whether the child in fact was dependent, and thus within the court's jurisdiction. If so, FLA. STAT. § 39.09(3) (1977) then required a separate disposition hearing at which child-welfare officers were required to submit a predisposition report. The two requisite hearings in this instance were combined into a single summary hearing, and no report was prepared or presented. 743 F.2d at 1491 n.3.

5. Appellant did not receive formal notice of the order for more than two months. *Id.* at 1492.

6. Appellant's claim that the issuing judge lacked personal jurisdiction was based on failure to provide her with notice, and violation of the applicable statutes. *Id.* at 1496-97.

7. *See supra* note 3.

8. Appellant's claim was based on 42 U.S.C. § 1983 (1976), which in pertinent part provided: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

---

*Mr. Waters is currently a law student at the University of Florida College of Law in Gainesville, Florida and expects to graduate in December, 1986. He is a member of the University of Florida Law Review as well as a member of the American Bar Association Law Student Division.*

## Contents

CASENOTE

509  Federal Tort Law: Judges Cannot Invoke Judicial
     Immunity for Acts that Violate Litigants' Civil
     Rights—*Dykes v. Hosemann*
     *Robert Craig Waters*

trict court dismissed the complaint.[9] The Eleventh Circuit Court of Appeals reinstated the action and held, a judge acting in the clear absence of personal jurisdiction is subject to suit for tortious conduct.[10]

The use of personal jurisdiction as a limitation on judicial power evolved early in the common law from principles of Magna Charta.[11] English courts recognized that judges were liable in damages when attempting to exercise authority over individuals clearly outside their jurisdiction.[12] Without a proper forum, such actions represented usurped power and were void.[13] Thus, early conceptions of personal jurisdiction rested on due process concerns.[14]

In America, a federal union of theoretically sovereign states made personal jurisdiction more troublesome. The Fourteenth Amendment[15] bound states for the first time to due process standards imposed by federal courts, but gave no theoretical framework for their development. At first, the Supreme Court formulated a theory of personal jurisdiction based largely on state sovereignty.[16] State courts exercised unquestionable authority only over people and property within their borders and only to the extent of the jurisdiction conferred.[17] New forms of transportation enabling people to cross state lines with ease

9. 743 F.2d at 1493.

10. *Id.* at 1497.

11. *E.g.,* The Case of the Marshalsea, 77 Eng. Rep. 1027 (K.B. 1613) (no immunity when Court of Marshalsea asserted authority outside the king's household, its sole jurisdiction). The *Marshalsea* case traced jurisdictional limitations to MAGNA CHARTA, art. 39. *Id.* at 1035. This article said no free man could be subjected to a loss of rights except through judgment of his peers or by the law of the land. *See* J. C. HOLT, MAGNA CHARTA 326–27 (1965) (for full text of MAGNA CHARTA, art. 39). But for a case arguing that a judge was answerable only to the king, *see* Floyd v. Barker, 77 Eng. Rep. 1305, 1307 (Star Chamber, 1608). This view was not shared by all courts in England. *See infra* note 12. It probably reflected the tendency of the Star Chamber to serve as "an instrument of oppression" wielded by the Tudor and Stuart kings, leading to its abolition fifty-three years after the *Floyd* case. *See* C. G. WEERAMANTRY, AN INVITATION TO THE LAW 279 app. (1982) (Star Chamber abolished in 1661 because of its odiousness to the English people).

12. *See* Houlden v. Smith, 117 Eng. Rep. 323 (Q.B. 1850) (Spilsby County judge held liable in trespass for asserting jurisdiction over man in adjoining county). The *Houlden* court noted that a county judge "would have had jurisdiction to summon and commit the plaintiff if he had dwelt or carried on business within the limits of the Spilsby Court." *Id.* at 326. This demonstrates personal jurisdiction as a common-law limitation on immunity.

13. *See Marshalsea,* 77 Eng. Rep. at 1,038. For a modern reiteration of this concept, compare with World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 288–90 (1980) (absence of due process or notice renders a judgment void in every jurisdiction).

14. The earliest formulation of these principles was in MAGNA CHARTA. *See supra* note 11 and accompanying text. They were adopted into American jurisprudence through the Bill of Rights, and imposed upon the states by the Fourteenth Amendment. *See infra* note 59 and accompanying text. The requirement of notice to those whose rights might be adjudicated became central to due process and personal jurisdiction. *See* Kulko v. Superior Court, 436 U.S. 84, 91 (1978) (existence of personal jurisdiction depends upon presence of reasonable notice to parties).

15. U.S. CONST. amend. XIV.

16. Pennoyer v. Neff, 95 U.S. 714 (1878).

17. *Id.* at 720.

soon made this theory inadequate,[18] and the Supreme Court tried several new approaches based more on general due process standards.[19]

In *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinea*,[20] the Supreme Court abandoned sovereignty theories completely and declared that personal jurisdiction was a function solely of the Due Process Clause.[21] Limitations on judicial power flowed not from states' rights, but personal liberty interests.[22] A central concern was the requirement of notice.[23] Applying this theory, the *Ireland* court upheld sanctions against alien defendants[24] who, in a diversity action, ignored a discovery order on grounds the court lacked personal jurisdiction.[25] The *Ireland* court reasoned that refusal after proper notice constituted constructive waiver of the jurisdictional objection.[26]

Less clear was the degree to which the Due Process Clause, through the ambit of personal jurisdiction, imposed limits on judicial immunity.[27] Formerly, American courts had adopted common-law precedents.[28] However, civil rights legislation enacted to implement the Fourteenth Amendment[29] raised difficult questions about

18. *See* Lewis, *The Three Deaths of "State Sovereignty" and the Curse of Abstraction in the Jurisprudence of Personal Jurisdiction*, 58 NOTRE DAME L. REV. 699, 705 (1983) [hereinafter cited as *State Sovereignty*] (Supreme Court backed off sovereignty theories because of auto accident cases involving out-of-state residents).

19. *E.g., World-Wide Volkswagen*, 444 U.S. 286, 291–92 (1980) ("minimum contacts" between a party and the forum state are prerequisite to personal jurisdiction, thus protecting state sovereignty interest and due process). *See State Sovereignty*, *supra* note 18, at 699 (Supreme Court has waivered in its estimation of the importance of state sovereignty as weighed against due process in determining issues of personal jurisdiction).

20. 456 U.S. 694 (1982).

21. *Id.* at 702–03.

22. *Id.* at 702 n.10.

23. *Id.* at 698.

24. At issue were $20 million in insurance contracts signed in London to cover respondent's bauxite operations in Guinea. When alleged mechanical problems interrupted those operations, respondent filed a claim. Petitioner refused to indemnify on grounds the mechanical problems were not covered by contract terms. Respondent then filed suit in the Western District of Pennsylvania, asserting jurisdiction based on diversity of citizenship. Petitioners contended this was an improper forum. *Id.* at 697–98.

25. *Id.*

26. *Id.* at 699.

27. Whether judicial immunity is limited by the Due Process Clause is a question not yet decided by the Supreme Court. *See Dykes*, 743 F.2d at 1496. *See also State Sovereignty*, *supra* note 18, at 848–53 (the Supreme Court has not considered due process issues in deciding judicial immunity cases).

28. As in the common law, the central issue was the scope of a court's jurisdiction. As early as 1806, the federal courts had recognized a right to sue for trespass when a judge, lacking jurisdiction, adjudicated the rights of individuals. Wise v. Withers, 7 U.S. (3 Cranch) 331 (1806). This included use of otherwise legitimate process to prevent a slave-owner from regaining possession of a runaway slave sojourning in a free state. Johnson v. Tompkins, 13 F. Cas. 840 (E.D. Pa. 1833) (No. 7,416). But early cases seemed to have focused entirely on subject-matter jurisdiction, leading some courts to conclude that its presence alone would cloak a state court's actions with immunity. *E.g.*, Green v. Maraio, 722 F.2d 1013 (2d Cir. 1983) (citing Stump v. Sparkman, 435 U.S. 349, 357 (1978)).

Nonetheless, under *Pennoyer*, 95 U.S. at 732, any attempt to exercise authority beyond a state's territorial limits was mere abuse, subject to collateral attack and invalidation in any other forum. *Id.* at 720. A central requirement was service of process. *Id.* at 732. Personal jurisdiction thus was not a major concern since long-arm jurisdiction virtually was impossible under this theory, and jurisdiction of forum-state citizens was assumed. Thus, subject-matter jurisdiction was the most likely focus of controversy in tort claims against judges.

29. *E.g.*, 42 U.S.C. § 1983 (1982); and 42 U.S.C. § 1985 (1982).

512                    TORT & INSURANCE LAW JOURNAL

state-court immunities.[30] Despite legislative history to the contrary,[31] the Supreme Court concluded that Congress had not abolished common-law immunities in civil rights actions.[32] In *Stump v. Sparkman*,[33] the court extended this immunity to shield a state judge who, without evidence or formality, approved a mother's petition for sterilization of a somewhat retarded daughter.[34] This action possessed judicial character,[35] concluded the *Stump* court, and thus was immune.[36]

30.  Whether Congress had abolished judicial immunity in federal civil rights actions remained unsettled until Pierson v. Ray, 386 U.S. 547 (1967). An earlier case, Tenney v. Brandhove, 341 U.S. 367 (1951), had foreshadowed this conclusion by extending immunity from such actions to state legislators. Until these cases were decided, federal appeals courts had ruled that the plain language of 42 U.S.C. § 1983 did not exempt judges. E.g., McShane v. Moldovan, 172 F.2d 1016 (6th Cir., 1949) (judges not immune from federal civil rights action).

After the Supreme Court's decision on legislative immunity, some federal courts concluded that judicial immunity also must have survived enactment of the civil rights legislation. E.g., Arnold v. Bostick, 339 F.2d 879 (9th Cir. 1964) (judges held immune), *cert. denied*, 382 U.S. 858 (1965). The extension of judicial immunity to civil rights actions has prompted criticism. See Rosenberg, Stump v. Sparkman: *The Doctrine of Judicial Impunity*, 64 VA. L. REV. 833, 833 (1978) [hereinafter cited as *Judicial Impunity*] (*Stump* and its predecessor cases have prompted much criticism).

31.  During debate on the Civil Rights Act of 1871, three congressmen expressed the opinion that judges would be liable under the act. *See* CONG. GLOBE, 42nd Cong., 1st Sess. 217 app. (1871) (statement of Sen. Thurman); *id.* at 385 (statement of Rep. Lewis); and *id.* at 365–66 app. (statement of Rep. Arthur). Proponents of the proposed legislation, without mentioning judicial immunity, decried the tyranny and lawlessness of southern county judges. Rep. Rainey noted that southern courts were under control of men "wholly inimical to the impartial administration of law and equity." *Id.* at 394. Rep. Platt argued that southern county judges were "little kings" who exercised despotic powers without regard for justice. *Id.* at 186 app. *See also Pierson*, 386 U.S. at 558–61 (Douglas, J., dissenting) (every member of Congress in the debate assumed judges would be liable).

32.  *Id.* at 555 (Congress did not intend to abolish common-law immunities). This was a puzzling conclusion, since *Pierson* seemed at odds with the common law of judicial immunity as it existed following the Civil War. For instance, a distinction often made in immunity case law was between courts of general jurisdiction and courts of limited jurisdiction. Full immunity often was granted only to the former. *See Stump*, 435 U.S. at 359. Yet, the *Pierson* court ignored this distinction, apparently extending full immunity even to courts of limited jurisdiction. The distinction resurfaced a decade later in *Stump*, 435 U.S. at 359. Yet even *Stump* may have gone beyond the limits of common-law immunity. The Supreme Court, in its most recent judicial immunity case prior to passage of the Civil Rights Act of 1871, had noted that judges of general jurisdiction were not liable "unless perhaps when the acts . . . are done maliciously or corruptly." Randall v. Brigham, 74 U.S. (7 Wall.) 523, 535–36 (1869). And a noted Reconstruction era constitutional scholar, writing the year of the Civil Rights Act of 1871, stated that "the want of jurisdiction is equally fatal in the proceedings of each [type of court, general and limited]. . . ." T. M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 406 (1871). Yet the *Stump* court held that nothing, not even corruption and malice, will strip a judge of immunity so long as his acts are judicial in character. 435 U.S. at 355–56.

33.  435 U.S. 349.

34.  *Id.* at 351–55.

35.  The *Stump* court held that any act possessing judicial character was immune, even if marred by grave procedural errors. "Judicial character" meant that the act in question was one normally done by a judge and that the parties dealt with the judge in a judicial capacity. *Id.* at 362. Further, only the clear absence of all jurisdiction would extinguish immunity. *Id.* at 356–57 (citing Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351 (1872)). But the *Stump* court did not say what this meant. *Id.* at 359. Other case law has asserted that a lack of personal jurisdiction made a court's decision "illegitimate" and "mere abuse." *Pennoyer*, 95 U.S. at 720. This analysis of personal jurisdiction has led two appeals circuits to conclude that a clear lack of personal jurisdiction is the equivalent of a clear lack of all jurisdiction. See *Dykes*, 743 F.2d at 1497; and *Rankin*, 633 F.2d at 848–49. Such a conclusion is bolstered by the Supreme Court's recent conception of personal jurisdiction as a function of U.S. CONST. amend. XIV. *See Ireland*, 456 U.S. at 702–03. Thus, personal jurisdiction arises from individual liberty interests that restrict state power.

36.  435 U.S. at 364.

Still unresolved, however, was the relationship between immunity and personal jurisdiction. In *Rankin v. Howard*,[37] a federal appeals court confronted the question for the first time since passage of the Fourteenth Amendment.[38] The court overruled summary judgment in favor of a state judge who, without notice, had made an adult male the ward of his parents so they might detach him from a religious cult[39] in another state[40] and "deprogram" him.[41] Returning to the common-law standard,[42] the *Rankin* court concluded that a tribunal acting in the clear absence of personal jurisdiction forfeited immunity.[43] One basis of this decision was the Supreme Court's increased emphasis on the Due Process Clause in personal jurisdiction issues.[44]

Drawing heavily on *Rankin*, the instant court reached a similar conclusion.[45] The majority reasoned that personal jurisdiction was the foundation of a judge's power to act, and noted that the only issue in *Stump* was whether subject-matter jurisdiction existed.[46] Citing case law leading to *Ireland*,[47] the instant court concluded that personal and subject-matter jurisdiction must coexist. The clear absence of either one would extinguish judicial immunity.[48] However, judges would only be subject to liability where they acted in the face of clearly valid statutes or precedent expressly depriving them of jurisdiction.[49] As a matter of policy, a judge must be free to decide complex jurisdictional questions without fear of liability.[50]

In a strong dissent, Justice Hill attacked the majority for eroding principles of judicial immunity recognized by other courts.[51] The majority's opinion would let disgruntled litigants summon a judge before another tribunal to defend prior decisions.[52] Rejecting personal jurisdiction as a gauge for immunity, Justice Hill

37. 633 F.2d 844 (9th Cir. 1980).
38. *See id.* at 848.
39. The plaintiff had joined the Unification Church of Korean minister Sun Myung Moon. *Id.* at 846.
40. The parents filed their petition in Kansas probate court. They falsely alleged that their son was a Kansas resident when in fact he was from Missouri. Upon execution of the order, the parents tricked him into flying to Kansas, where he was taken into custody. *Id.*
41. The son was confined to a motel room by his parents' attorneys and subjected to "deprogramming." *Id.*
42. *See supra* notes 12–14 and accompanying text.
43. 633 F.2d at 848–49.
44. *Id.* The *Rankin* court cited *Kulko*, 436 U.S. at 91, which stated that a valid judgment may be entered only by a court having personal jurisdiction. *Compare Ireland*, 456 U.S. at 501 n.10 (personal jurisdiction is a function of Due Process Clause, which restricts state power and protects individual liberty interests).
45. 743 F.2d at 1497.
46. *Id.*
47. *Id.* The instant court cited *International Shoe*, 326 U.S. at 310. *Compare Ireland*, 456 U.S. at 501 n.10 (personal jurisdiction is function of Due Process Clause, not state sovereignty). *International Shoe* was one of several earlier cases that placed increasing emphasis on due process as the basis of personal jurisdiction and thus foreshadowed *Ireland*.
48. 743 F.2d at 1497.
49. *Id.*
50. *Id.*
51. *Id.* at 1500–03.
52. *Id.* at 1501.

suggested that only clear absence of any type of jurisdiction should deprive a court of its privileges.[53] Accordingly, he proposed affirming dismissal of the complaint on grounds the state judge possessed subject-matter jurisdiction. Conceding this point, the majority rejected the dissent's proposal and ordered the district court to reexamine the issue of personal jurisdiction.[54]

Guarding personal due process rights is a primary duty of the judiciary. The instant court sought to preserve these rights by depriving judges of immunity to the extent that they knowingly abandon proper procedure.[55] Although a sweeping grant of immunity seemed implicit in *Stump*,[56] the instant court balked at the possibility of judicial abuse and impunity if such a shield were erected. Such a concept of immunity would be hard to reconcile with the due process basis of personal jurisdiction announced in *Ireland* and its predecessor cases.[57]

Indeed, *Ireland* equates due process with personal jurisdiction.[58] If one does not exist, neither does the other. As in the English common-law precedents, personal jurisdiction is present only when a person's rights are adjudicated in a proper forum that adheres to proper procedure. In turn, proper procedure is defined according to traditions of impartiality and procedural uniformity first outlined in Magna Charta, subsequently incorporated into the Constitution and later imposed upon the states by the Fourteenth Amendment.[59] By confining immunity within these same due process boundaries, the instant court avoided a tacit declaration that judges alone are absolutely privileged to violate the rights of citizens.

*Stump, Rankin* and Justice Hill's dissent agree that such a declaration would be error. Their disagreement is how to limit immunity in a meaningful way. *Stump* suggests that immunity attaches to any act that may be defined as judicial.[60] In practice, however, a corrupt judge might abuse his authority with impunity merely by casting his actions in a judicial mold, and only ineptitude would subject him to suit. Justice Hill's dissent, expressing a view shared by other circuits,[61] suggests that the mere presence of subject-matter jurisdiction cloaks a judge with judicial immunity. Logically, however, the power to adjudicate a general type of legal question does not confer authority over the parties to a specific dispute. Such a notion would render a court immune even if it terminated a citizen's

---

53. *Id.* at 1502–03. Justice Hill drew heavily on the language of *Stump*, 435 U.S. 349. However, the *Stump* court's emphasis on "clear lack of all jurisdiction" is not necessarily the same thing as the clear lack of any kind of jurisdiction. *See supra* note 35. *But see* Green v. Maraio 722 F.2d 1013, 1017 (2d Cir. 1983) (presence of subject-matter jurisdiction alone creates immunity).

54. 743 F.2d at 1500.

55. An important distinction is between a knowing abandonment and an erroneous abandonment of proper procedure. Dicta in the case states that liability to suit would attach only to the former. *Id.* at 1497.

56. Some courts have so assumed. *E.g., Green,* 722 F.2d at 1017.

57. *See supra* note 19.

58. 456 U.S. at 501 n.10 (Due Process Clause is the only source of the personal jurisdiction requirement).

59. *See* Duncan v. Louisiana, 391 U.S. 145, 147–48 (1968) (Fourteenth Amendment binds states to respect rights guaranteed by first eight amendments).

60. *See supra* notes 35 and 53.

61. *See supra* note 56.

rights without notice or process, even if irreparable harm was the result, and even if the judge's motives were unabashedly corrupt.[62] The possibility of such an outcome flaunts the concept of ordered liberty mandated by the Fourteenth Amendment.

The ancient common-law limitations of judicial immunity, requiring judges to respect lawful procedure, are a better device in a nation of states now obliged to observe federal procedural standards. Under *Ireland* analysis, state sovereignty must bow to the requirements of the Due Process Clause, which binds the states to a minimum concept of procedural justice.[63] In the face of wilful due process violations by a judge acting under color of state law, judicial immunity will prevail only at the expense of the Fourteenth Amendment's declaration that everyone will receive this basic justice.

Under *Ireland*, assertions of judicial power in the absence of personal jurisdiction violate the Due Process Clause.[64] It is inconsistent to give personal jurisdiction a foundation implanted on the Fourteenth Amendment and then render the guarantee of due process meaningless through a judge-made doctrine.[65] Such a concept, implicit in *Stump* and the instant dissent, ignores issues that are of constitutional dimension while stressing a distorted reading of common-law precedents.[66] Limiting immunity by imposition of due process standards, which is the *Rankin* court's solution, grants substantial protection to judges while respecting both the modern rational underlying personal jurisdiction and the ancient common law.

A desire to protect the principled impartiality of judges is the commendable goal of all immunity doctrines.[67] However, the judiciary must question doctrines that shield judges who are neither principled nor impartial. A logical result of sweeping judicial

---

62. Zarcone v. Perry, 438 F. Supp. 788 (E.D.N.Y. 1977), *aff'd*, 572 F.2d 52 (2d Cir. 1978), illustrated the inadequacy of the immunity theories of *Stump* and Justice Hill's dissent. In *Zarcone*, the defendant judge was held liable under 42 U.S.C. § 1983 for ordering a deputy to bring a coffee vendor before him in handcuffs. In a "pseudo-official inquisition," the defendant judge offered to "drop the charges" if the vendor would admit he had diluted the judge's coffee. *Id.* at 53–54. Under *Stump* analysis, the defendant judge's actions could be considered immune because they were judicial in character, similar to the activity of any judge in a criminal proceeding. Under Justice Hill's analysis the defendant judge might be held immune because, as a judge of general jurisdiction, he had subject-matter jurisdiction over any matter not denied him by statute. Judicial abuses like that in *Zarcone* are not isolated incidents. *See, e.g.*, Alschuler, *Courtroom Misconduct of Prosecutors and Trial Judges*, 50 TEX. L. REV. 629, 735 (1972) (misconduct of judges is a more serious problem than misconduct of attorneys).

63. *See supra* note 59.

64. 456 U.S. at 503.

65. Logically, a constitutional right should receive greater weight than a judge-made immunity, at least to the extent that they are inconsistent. Such a conclusion is compelling in federal civil rights legislation, since Congress probably did not intend to confer sweeping immunity to state judges. *See supra* note 31. Further, the Supreme Court in *Pierson*, 386 U.S. at 555, announced a goal of preserving common-law immunities; but immunity grants in *Pierson* and *Stump* go beyond immunities extant when the Civil Rights Act of 1871 was enacted. *See supra* note 32.

66. *See supra* notes 31–32.

67. This is the stated rationale of *Pierson*, 386 U.S. at 554, which established judicial immunity in federal civil rights actions. *See supra* note 30 and accompanying text. *Accord* Ferri v. Ackerman, 444 U.S. 193 (1979) (immunity preserves fearless impartiality of officials).

516          TORT & INSURANCE LAW JOURNAL

immunity is the abrogation of due process rights to the extent a judge chooses to act corruptly. The instant court better serves the stated goal by employing the Due Process Clause as a limit on immunity. Otherwise a judge's duty to protect individual rights would proceed hand-in-hand with an equal privilege of eviscerating those rights for the most arbitrary of reasons.

**EXHIBIT** 15

10-3-2011

Fax from Atty Morrissey
to CA State Bar

**EXHIBIT** 15

10/03/2011   05:49   © 0000000                                    LAW OFFICE                          PAGE   01/02

P.O. BOX 2549
CUPERTINO, CA 95015-2549
(408) 872-1850
(408) 741-1671 — Facsimile No.

LAW OFFICES OF

# Fax

| To: | State Bar Court | From: | Michael Morrissey |
|---|---|---|---|
| Fax: | (415) 538-2043 | Pages: | 2, including this page |
| Phone: | | Date: | 10/3/2011 |
| Re: | Michael Morrissey - #062195 | CC: | Office of Chief Trial Counsel – (415) 538-2284 |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply

◉ Comments:

# RECEIVED
OCT - 3 2011

STATE BAR OF CALIFORNIA
ENFORCEMENT - SF

CONFIDENTIALITY NOTICE

The information contained in this facsimile message is information protected by attorney-client and/or the attorney work-product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of this facsimile is not the named recipient or the employee or agent responsible for delivering this facsimile to the named recipient any use, dissemination, distribution, or copying of the communication is strictly prohibited. If this facsimile communication has been received in error, please immediately notify us by telephone and return the original communication to the address listed above via the U.S. Postal Service.

IF YOU HAVE ANY PROBLEM WITH THE RECEIPT OF THIS TRANSMISSION,

OCT-03-2011   05:49                                                                96%                  P.01

# EXHIBIT I

10/03/2011   05:48   000000        LAW OFFICE        PAGE   02/02

## MICHAEL T. MORRISSEY
## LAW OFFICES OF MICHAEL T. MORRISSEY
P.O. Box 2549
Cupertino CA 95015-2549
(408) 872-1850
(408) 741-1671 — Facsimile

October 3, 2011

State Bar Court
State Bar of California
180 Howard Street
San Francisco, CA 94105

      Re:   Michael T. Morrissey – CSBN: 062195
           Hearing of Today's Date

The Honorable Presiding Judge of the State Bar Court:

     I was advised late last night that there is a hearing today regarding disciplinary charges that have been brought against me. While I have not had an opportunity to investigate exactly why I have not received notice of this matter or any hearings, I do know that it relates to my wife, who apparently been suffering from mental health issues, and not the State Bar Court.

     I am starting a trial today in the Santa Clara County Superior Court and have spent every moment since I was reinstated on Friday preparing for this trial. This trial was continued from August 1, 2011 to today due to the suspension I served following my graduation for LAP and the ADP program. I do not have any option but to fully represent my client and try his case. This case currently has a two week time estimate by all parties.

     I am requesting that any hearing scheduled for today be continued, so as to allow a formal application and the possible hiring of counsel on my behalf.

                    Very truly yours,

                    Michael T. Morrissey

cc: Office of Chief Trial Counsel

OCT-03-2011   05:49   000000000        93%        P.02

- 220 -

**EXHIBIT** 16

10-4-2011
State Bar Court Minute Order
to Atty Morrissey

**EXHIBIT** 16

| STATE BAR COURT OF CALIFORNIA | FOR CLERK'S USE ONLY: |
|---|---|
| HEARING DEPARTMENT<br><br>180 Howard St., 6th Fl., San Francisco, CA 94105 | **FILED**<br><br>OCT 04 2011<br><br>STATE BAR COURT CLERK'S OFFICE<br>SAN FRANCISCO |

| In the Matter of:<br><br>MICHAEL T. MORRISSEY<br>Member No.: 62195<br><br>A Member of the State Bar. | Case No(s): 10-O-09718-LMA<br><br>MINUTE ORDER<br><br>☒ Pretrial Conf.  ☐ Motion Hrg.  ☐ Default Hrg.<br><br>Date held: October 3, 2011   Time: 11:00 a.m. |
|---|---|

**APPEARANCES:**

Deputy Trial Counsel  Christine A. Souhrada      ☒ Appeared  ☐ No Appearance
Respondent           Michael T. Morrissey        ☐ Appeared  ☒ No Appearance  ☐ Co-counsel  ☐ In Pro per
Counsel                                          ☐ Appeared  ☐ No Appearance  ☐ None

**CONFERENCES:**

☐ Status Conference:          ☐ In person   ☐ Telephonic _____
☐ Settlement Conference:      ☐ In Person   ☐ Telephonic _____
☐ Further Pretrial Conference: ☐ In Person  ☐ Telephonic _____

**ORDERS:**

☐ Motion of ☐ Deputy Trial Counsel; ☐ Resp./Appl./Petit.; ☐ Court for: _____
   ☐ No opposition  ☐ Granted  ☐ Denied
☐ Matter  ☐ off calendar due to _____
   ☐ continued to _____
☐ Trial continued to _____ at _____
☐ Briefs due:  ☐ Deputy Trial Counsel _____  ☐ Respondent _____
☐ Parties waive service of order.
☒ Other  Respondent failed to appear at the Pre-Trial conference and has failed to appear at every single court related
event. Respondent's default will be entered if he fails to appear at trial. Trial will start at 10:30 on October 11, 2011.
_____
_____
_____
_____
_____

**IT IS SO ORDERED.**

Dated: October  3 , 2011

LUCY ARMENDARIZ
Judge of the State Bar Court

Minute Ord - (Rev. 02/05)

# CERTIFICATE OF SERVICE

[Rules Proc. of State Bar; Rule 5.27(B); Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court of California. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of San Francisco, on October 4, 2011, I deposited a true copy of the following document(s):

MINUTE ORDER

in a sealed envelope for collection and mailing on that date as follows:

☒   by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at San Francisco, California, addressed as follows:

MICHAEL THOMAS MORRISSEY
PO BOX 2549
CUPERTINO, CA   95015

☒   by fax transmission, at fax numbers (408) 741-1671. No error was reported by the fax machine that I used.

☒   by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

CHRISTINE A. SOUHRADA, Enforcement, San Francisco

I hereby certify that the foregoing is true and correct. Executed in San Francisco, California, on October 4, 2011.

Bernadette C.O. Molina
Case Administrator
State Bar Court

-223-